17-1192

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

ANDY KERR, Colorado State
Representative, et al.,

      Plaintiffs - Appellants,

v.

JARED POLIS, Governor of
Colorado in his official capacity,

      Defendant - Appellee.

On Appeal from the United States District Court for the District of
Colorado
D.C. No. 1:11-CV-01350-RM-NYW
The Honorable Raymond Moore, United States District Judge

## GOVERNOR'S PETITION FOR REHEARING EN BANC

PHILIP J. WEISER
Attorney General
ERIC R. OLSON*
Solicitor General
MEGAN PARIS RUNDLET*
Assistant Solicitor General
STEPHANIE LINDQUIST
SCOVILLE*
Senior Assistant Attorney
General
KATHLEEN SPALDING*
Senior Assistant Attorney
General

MICHAEL KOTLARCZYK*
Assistant Attorney General

Ralph L. Carr Colorado Judicial
  Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000

*Attorneys for Defendant-
Appellee Jared Polis, Governor of
Colorado*

# TABLE OF CONTENTS

RULE 35 STATEMENT ............................................................... 1

BACKGROUND ......................................................................... 3

REASONS FOR REHEARING EN BANC ................................. 5

I.   The panel opinion conflicts with *City of Hugo* on political
     subdivision standing. ..................................................... 6

     A. Political subdivisions do not have standing unless a federal
        statute specifically provides them with rights. ............................ 7

     B. *City of Hugo* defeats Plaintiffs' claims under both the
        Guarantee Clause and the Enabling Act....................................... 8

        1. The Guarantee Clause does not create standing.............. 9

        2. The Enabling Act does not create standing..................10

     C. The panel opinion conflicts with *City of Hugo*............................ 13

II. None of the plaintiffs have standing to assert Guarantee Clause-
    based claims because such claims are nonjusticiable................20

CONCLUSION ...................................................................... 21

*Kerr v. Polis*, Case No. 17-1192 (10th Cir. July 22, 2019)......Attachment

# TABLE OF AUTHORITIES

## CASES

*Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 135 S. Ct. 2652 (2015) ............................................................ 4

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) .......... 9

*Branson School District RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998) .......................................................................... 11, 12, 19

*City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011) ... ..................... ...............1, 2, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22

*City of Trenton v. New Jersey*, 262 U.S. 182 (1923) ............................. 7, 8

*Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007) .................................. 16, 17

*Havens v. Colo. Dep't of Corr.,* 897 F.3d 1250 (10th Cir. 2018) .............. 20

*Hickenlooper v. Kerr*, 135 S. Ct. 2927 (2015) ........................................ 4

*Hous. Auth. of the Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183 (10th Cir. 1991) ........................................ 9, 10, 12

*Hunter v. Pittsburgh*, 207 U.S. 161 (1907) ............................................. 8

*Initiative and Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ................................................................. 15, 16

*Kerr v. Hickenlooper*, 744 F.3d 1156 (10th Cir. 2014) ........................ 3, 21

*Kerr v. Hickenlooper*, 824 F.3d 1207 (10th Cir. 2016) ............................ 4

*Kerr v. Polis*, Case No. 17-1192 (10th Cir. July 22, 2019)………………….

………………………….…………………………………….5, 13, 14, 15, 16, 18, 19

*Largess v. Sup. Jud. Ct. for Mass.*, 373 F.3d 219 (1st Cir. 2004) ........... 16

*Pac. States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912) ...................................................................................... 21

*R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941) .................... 18

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ....... 1, 2, 5, 6, 20, 21, 22

*United States v. Ramos*, 695 F.3d 1035 (10th Cir. 2012) ................... 2, 20

## CONSTITUTIONS

Colo. Const. art. X, § 20 ................................................................... 3

## STATUTES

Colorado Enabling Act, ch. 139, 18 Stat. 474 (1875) ....................... 12, 13

## RULE 35 STATEMENT

Federal courts are not the right place to resolve disagreements between a state and its school districts, special district boards, and boards of county commissioners about how a state has set economic policy. Under controlling law, these political subdivisions do not have standing to use federal courts to challenge state economic policy—regardless of the merits of their complaints about the policy. Those complaints are better addressed to the ballot box, not the courtroom.

Because the panel opinion conflicts with controlling law on standing, rehearing en banc is appropriate. The panel opinion conflicts with *City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011), and consideration by the full court is necessary to secure and maintain uniformity of the Court's decisions. In addition, the panel opinion conflicts with the United States Supreme Court's June 27, 2019, decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

*City of Hugo* held that political subdivisions of a state do not have standing to sue their parent states unless a federal statute gives them

enforceable rights. Here, the panel majority declined to apply this bright-line rule from *City of Hugo* because it incorrectly concluded that the standing inquiry was intertwined with the merits—that is, if the two inquiries were closely related, the Court should skip the standing analysis altogether. As a result, the majority necessarily held that Plaintiffs had standing without first determining whether any federal statute provided them enforceable rights. The dissent and the district court applied the *City of Hugo* rule and concluded that no federal statute affords these plaintiffs enforceable rights.

*Rucho* clarified the rule that claims under the Guarantee Clause—like those brought here—do "not provide the basis for a justiciable claim." 139 S. Ct. at 2506. Because standing is one component of justiciability, this holding that Guarantee Clause claims are not justiciable necessarily disposes of the standing inquiry. *United States v. Ramos*, 695 F.3d 1035, 1046 (10th Cir. 2012) (stating that "standing is a question of justiciability") (quotation omitted).

No federal statute or constitutional provision provides standing for the political subdivisions here. Rehearing en banc is therefore warranted.

## BACKGROUND

In 2011, several state legislators and others sued to invalidate Article X, § 20 of the Colorado Constitution, better known as TABOR. *See Kerr v. Hickenlooper*, 744 F.3d 1156, 1162 (10th Cir. 2014) ("*Kerr I*"). TABOR, adopted by voters in 1992, requires, among other things, voter approval for any new taxes, tax rate increases, and spending increases that outpace inflation plus population growth. *Id.* at 1161-62.

The State moved to dismiss under Rule 12(b)(1), explaining that Guarantee Clause claims present nonjusticiable political questions and that no plaintiff had standing. This Court initially concluded that the state legislators had standing to maintain this lawsuit. *Id.* at 1182-83. The Supreme Court granted certiorari, vacated that order and remanded "for further consideration in light of *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 135 S. Ct.

2652 (2015)." *Hickenlooper v. Kerr*, 135 S. Ct. 2927 (2015). On remand,

this Court concluded that the plaintiff-legislators lacked standing. *See*

*Kerr v. Hickenlooper*, 824 F.3d 1207, 1218 (10th Cir. 2016). This Court

remanded the case to the district court to determine "whether the non-

legislator plaintiffs possess standing." *Id.* If it were to hold "that some

other plaintiffs possess standing, the district court may then consider

justiciability hurdles." *Id.* at 1217.

Back in district court, Plaintiffs amended their complaint for the

fourth time to add political subdivisions as plaintiffs. *See* JA 1419.[1] The

district court concluded that the plaintiffs who are elected officials,

educators, and/or citizens do not have Article III or prudential standing,

and that the political subdivision plaintiffs lacked standing under *City*

*of Hugo* because no statute granted the subdivisions any rights they

sought to enforce in this lawsuit. JA 1574-84. Plaintiffs appealed only

the political subdivision ruling, and the panel majority reversed,

---

[1] This petition cites to the appendix with the abbreviation "JA," as the
parties did before the panel.

holding that the merits were so intertwined with the standing inquiry that the *City of Hugo* rule did not apply. Instead, the majority concluded that because the "political subdivision plaintiffs . . . cannot be *irrefutably* barred" by political subdivision standing, the case should proceed to the merits. Op. 19. The dissent explained that *City of Hugo* provided the operative rule and that Plaintiffs' arguments failed because they waived any claim that a federal statute provided them with rights and, regardless, no such statute actually provided them with rights. *Id.* at 20 ("Dissent").

## REASONS FOR REHEARING EN BANC

This case satisfies the criteria for rehearing en banc because the panel opinion conflicts with *City of Hugo* and the Supreme Court's recent opinion in *Rucho*.

The opinion did not apply the *City of Hugo* rule for determining whether political subdivisions have standing to sue their parent states. Instead, the opinion concluded the standing issue was intertwined with

the merits and allowed the case to proceed without conducting the

threshold analysis *City of Hugo* requires.

Additionally, the Supreme Court's recent clarification in *Rucho*

that Guarantee Clause claims are not justiciable further warrants en

banc review. When a claim is nonjusticiable, no one has standing.

## I. The panel opinion conflicts with *City of Hugo* on political subdivision standing.

"Under the doctrine of political subdivision standing, federal

courts lack jurisdiction over certain controversies between political

subdivisions and their parent states." *City of Hugo*, 656 F.3d at 1255.

Political subdivisions, like the plaintiffs here, cannot complain in

federal courts about decisions of states unless a specific federal statute

provides enforceable rights to them. *Id.* at 1257.

As the district court below and the dissent found, Plaintiffs do not

identify any federal law that grants rights related to their claims to

Colorado's political subdivisions. They do not, therefore, have standing.

The panel opinion holding otherwise is contrary to this Court's

precedent.

## A. Political subdivisions do not have standing unless a federal statute specifically provides them with rights.

In *City of Hugo*, an Oklahoma city sued the Oklahoma Water Resources Board, an arm of the state, arguing that the Board's water allocation decisions violated the dormant Commerce Clause. 656 F.3d at 1254. This Court held that the plaintiff did not have standing to sue.

The Court did not find "a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution. Instead, courts have allowed such suits only when Congress has enacted statutory law specifically providing rights to municipalities." 656 F.3d at 1257. Put differently: political subdivisions may sue their state only "when Congress enacts positive federal law affording rights to political subdivisions." *Id.* at 1263 (explaining scope and limitation of rule from *City of Trenton v. New Jersey*, 262 U.S. 182 (1923)).

This limitation on standing arises because the state creates political subdivisions as "convenient agenc[ies] for the exercise of such of the governmental powers of the state" as the state entrusts to them.

*City of Trenton*, 262 U.S. at 185-86. Whatever powers these political subdivisions possess "'rest[] in the absolute discretion of the state.'" *Id.* at 186 (quoting *Hunter v. Pittsburgh*, 207 U.S. 161, 178-79 (1907)). Accordingly, "'the state is supreme'" and "'may do as it will,'" for it is the "'state and those who legislate for the state [who] are alone responsible for any unjust or oppressive exercise of [this power.]'" *Id.* at 186-87 (quoting *Hunter*, 207 U.S. at 178-79).

Because the state has such authority and discretion in how it orders its affairs, absent a specific statutory right from federal law, political subdivisions do not have standing to pursue their grievances against their creating state in federal court.

**B.** ***City of Hugo* defeats Plaintiffs' claims under both the Guarantee Clause and the Enabling Act.**

*City of Hugo* requires courts to determine the specific basis of Plaintiffs' claims as a threshold matter. Because political subdivisions only have standing to bring claims under a federal statute that grants enforceable rights to subdivisions, political subdivision standing bars all

constitutional claims and those statutory claims not based on a statute that grants enforceable rights.

Plaintiffs' claims rely on, first, the Guarantee Clause of the federal Constitution, and second, the Colorado Enabling Act. *See* JA 1447. Neither claim creates standing.[2]

### 1. The Guarantee Clause does not create standing.

Plaintiffs do not have standing for claims under the Guarantee Clause of the Constitution. "It is well established that a political subdivision may not lodge constitutional complaints against its creating state." *Hous. Auth. of the Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183, 1188 (10th Cir. 1991). Prior to the panel opinion,

---

[2] The complaint contains two additional claims that do not affect the standing analysis. Count III asserts a violation of the Supremacy Clause, JA 1448, which provides no federal rights. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015) ("[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action.") (quotations and citations omitted). Count IV alleges that TABOR impermissibly amended Colorado's constitution because it violates the guarantee clauses contained in the U.S. Constitution and Colorado's Enabling Act. JA 1448-50. But that claim is derivative of the underlying claim that TABOR violates the Constitution and the Enabling Act.

there was not "a single case where a court of appeals or the Supreme Court has expressly allowed to proceed a claim by a municipality against its parent state premised on a substantive provision of the Constitution." *City of Hugo*, 656 F.3d at 1258.

Plaintiffs do not have standing to assert a constitutional violation against the state under the political subdivision doctrine.

### 2. The Enabling Act does not create standing.

Under *City of Hugo*, the Enabling Act can support standing only if it "specifically provid[es] rights to municipalities" or is "directed at protecting" them. *Id.* at 1257. It does not. Here, the political subdivisions do not have standing because, as the district court held, the guarantee to a republican form of government contained in Colorado's Enabling Act is directed to the people of Colorado, not to local boards of education and county commissions.

Before this decision, this Court had concluded that a federal law granted rights to a state's political subdivisions only twice. First, in *Kaw Tribe*, an Indian housing authority (a state agency under

Oklahoma law) brought constitutional and Fair Housing Act claims against an Oklahoma city. 952 F.2d at 1185. The Court held that the authority lacked standing to assert the constitutional claim but permitted it to pursue the Fair Housing Act claim. *Id.* at 1188. The Fair Housing Act permits lawsuits by any "aggrieved person," which the Supreme Court has interpreted broadly. *Id.* at 1193. Thus, "the court determined that the housing authority fell within the group of aggrieved parties to whom the Act contemplated providing rights." *City of Hugo*, 656 F.3d at 1257 (citing *Kaw Tribe*).

Second, the Court recognized political subdivisions' standing based on a federal law that specifically benefitted them in *Branson School District RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998). There, the plaintiff school districts challenged a Colorado law that altered the administration of a trust established by Congress in the Enabling Act for the benefit of Colorado public schools. *Id.* at 625. The "[m]ost important[]" factor to the Court's standing determination was that "the school districts are essentially the beneficiaries of the federal trust"

11

created by the Enabling Act. *Id.* at 629. Thus, *Branson* "merely held, consistent with our prior decision in *Kaw Tribe* . . . that *when Congress provides statutory rights to municipalities*, municipalities can enforce those rights through the Supremacy Clause against their parent states." *City of Hugo*, 656 F.3d at 1261 n.9 (emphasis added).

These two cases share a common feature that Plaintiffs' claims lack here: "In each case, the source of substantive rights was a federal statute directed at protecting the political subdivisions." *City of Hugo*, 656 F.3d at 1257. The Enabling Act provision at issue here is not directed at protecting political subdivisions. It authorized a state convention "to form a constitution and State government for said Territory: *Provided*, That the constitution shall be republican in form . . . ." Colorado Enabling Act, ch. 139, 18 Stat. 474 (1875). As the district court noted, "plaintiffs make no attempt to explain how this provision [of the Enabling Act] provides the political-subdivision plaintiffs with a right to a Constitution 'republican in form.'" JA 1583.

The district court's review of the Enabling Act makes clear that its guarantee of a republican form of government protects the people of Colorado, not the state's political subdivisions.

> [The Enabling Act] states that, in the event a State Constitution is formed "for the people" of Colorado, the State Constitution shall be submitted to the people for ratification. 18 Stat. 475 § 5. In other words, the language of the Enabling Act reflects that the State Constitution was formed *for the people of Colorado.* Not the State's political subdivisions.

JA 1583; *see also* Dissent 10 (Enabling Act is not "directed at protecting or specifically providing rights to Colorado's political subdivisions") (citing JA 1582-83). The Enabling Act's requirement that Colorado's constitution must be "republican in form" protects the people of Colorado, not other entities such as state boards of education, boards of county commissioners, or special districts.

Plaintiffs have failed to meet their burden to establish they have political subdivision standing to enforce the Enabling Act.

## C.   The panel opinion conflicts with *City of Hugo.*

As the dissent recognized, "the majority purports to *accept* the jurisdictional, decisional rubric laid out in our political-subdivision

standing cases but then effectively departs entirely from the requirements of that rubric in resolving this case." Dissent 16. Contrary to *City of Hugo*, the panel allows political subdivisions to sue their parent states without showing a federal statute provides substantive rights to the subdivisions.

The panel did not follow *City of Hugo* to determine whether the Enabling Act affords rights to political subdivisions. Instead, it concluded that it "cannot decisively determine if the political subdivision plaintiffs here are excepted from the usual bar to political subdivision standing because doing so would require impermissibly delving into the merits of the case." Op. 12. Thus, it assumed that the plaintiffs have standing and remanded the case to the district court for further proceedings. *See id.* at 19.

The panel's failure to determine whether Plaintiffs possessed standing was incorrect for three reasons.

*First*, the panel's conclusion that the standing inquiry is intertwined with the merits is incorrect. According to the majority,

"Establishing *who* was intended to benefit from the Enabling Act's 'republican in form' requirement necessarily begs the question of *what* a 'Republican Form of Government' is, which is the issue ultimately to be resolved . . . ." *Id.* at 12. But the "who" and the "what" are distinct here. The merits questions ask whether TABOR violates the guarantee of republican government contained in the Guarantee Clause or the Enabling Act. The standing question, by contrast, asks who has the right, if anyone, to challenge TABOR on these grounds. Determining whether these political subdivisions have standing under the Guarantee Clause and Enabling Act thus does not require a determination of whether TABOR violates either provision.

The majority's comparison of this case with *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006) is misplaced. Op. 15-16. *Walker* did not involve political subdivision standing at all, but instead addressed a situation where a court could not determine whether an "injury in fact" exists for Article III standing without resolving the merits. While the Court ultimately ruled against

plaintiffs on the merits of their First Amendment claim, it refused to

resolve the matter on standing grounds. 450 F.3d at 1087-98. Due to the

unique nature of First Amendment injuries, "the plaintiffs' asserted

injury" – a chilling effect on their speech – "and their claimed

constitutional violation were one and the same." *Day v. Bond*, 500 F.3d

1127, 1137 (10th Cir. 2007).[3]

    *Walker* requires the Court to "assume, during the evaluation of

the plaintiff's standing, that the plaintiff will prevail on his merits

argument." *Id.* "But there is still work to be done by the standing

requirement" that requires looking at the claims used to "establish

standing" before reaching the merits. *Id.* at 1137-38. Applying that

principle here demonstrates the distinction between the standing

question and the merits questions. Assuming that "Plaintiffs will

---

[3] The majority's reliance on an out-of-circuit case that predates *City of Hugo* and does not involve political subdivision standing also does not justify disregarding *City of Hugo*. Op. 17-19 (discussing *Largess v. Sup. Jud. Ct. for Mass.*, 373 F.3d 219, 224 (1st Cir. 2004) (standing issue of whether individual plaintiffs "share an undifferentiated harm with other voters" is intertwined with the merits)).

prevail on [the] merits" that TABOR violates the Enabling Act and the Guarantee Clause, that still does not establish that the plaintiffs have standing to bring these claims. *Id.* To establish standing, Plaintiffs must show that either the Enabling Act or the Guarantee Clause "afford[s] rights to political subdivisions" such as Plaintiffs. *City of Hugo*, 656 F.3d at 1263.

This situation is like the separate standing and merits issues in *Day*. There, the merits issue was whether a federal statute preempted state law and the standing question was whether that federal statute created a private cause of action. 500 F.3d at 1138. Here, whether TABOR violates federal law is a different question than whether these political subdivisions have the right to sue for any violations. Therefore, "the issue of standing is not necessarily determined by the merits determination," and the Court should decide standing here. *Id.*

*Second*, the panel majority's decision to simply assume standing creates particular problems for political subdivision standing. Allowing a political subdivision of a state to sue a state in federal court creates

concerns in our constitutional order. The "Constitution does not contemplate the rights of political subdivisions as against their parent states." *City of Hugo*, 656 F.3d at 1258. Permitting the intra-state dispute to proceed in federal court without the specific showing of a rights-creating federal statute first unnecessarily burdens the independence and sovereignty of the state. *See generally R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) ("the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments") (quotations omitted); Dissent 12 ("a political-subdivision plaintiff [must] show – as part of a *threshold jurisdictional standing inquiry* – that it seeks enforcement of a federal statute directed at protecting or specifically providing rights to political subdivisions like it"). The panel majority's holding here fails to afford states comity to arrange their internal affairs without undue interference from the federal government.

*Finally*, the panel majority's refusal to "determine if the political subdivision plaintiffs here are excepted from the usual bar to political subdivision standing" is incompatible with *Branson*. Op. 12. In *Branson*, the Court did not simply assume that the Enabling Act granted rights to the school districts and proceed to consider the merits. Instead, the Court engaged in a lengthy analysis of "political subdivision standing," and interpreted the Enabling Act as creating enforceable rights in the school districts. 161 F.3d at 628-30. The task before the Court here is the same: to determine whether Plaintiffs have identified any "statutory law specifically providing rights to" political subdivisions or "directed at protecting political subdivisions." *City of Hugo* 656 F.3d at 1257; *accord* Dissent 13 (*Branson* "requires [] a court to determine a federal statute's beneficiaries as part of its standing analysis and contemplates that a court may make such a determination without impermissibly implicating the merits").

The panel majority incorrectly failed to perform this threshold determination here. Because the panel concluded that Plaintiffs possess

standing without determining whether any federal statute grants them substantive rights, the majority's conclusion conflicts with *City of Hugo*.

Rehearing en banc is needed to resolve the conflict between *City of Hugo* and the panel opinion.

## II. None of the plaintiffs have standing to assert Guarantee Clause-based claims because such claims are nonjusticiable.

The Supreme Court's recent holding that "the Guarantee Clause does not provide a basis for a justiciable claim" further warrants this Court's en banc review. *See Rucho*, 139 S. Ct. at 2506; *cf. Havens v. Colo. Dep't of Corr.,* 897 F.3d 1250, 1259 (10th Cir. 2018) ("A federal court must in every case, and at every stage of the proceeding, satisfy itself as to its own jurisdiction, and the court is not bound by the acts or pleading of the parties.") (citations omitted).

Justiciability includes standing. *Ramos*, 695 F.3d at 1046 (stating that "standing is a question of justiciability") (quotation omitted). Because the Guarantee Clause claims are not justiciable under *Rucho*, Plaintiffs do not have standing to pursue them.

In *Kerr I*, this Court held that the Supreme Court had "explicitly rejected a categorical Guarantee Clause bar," and that Guarantee Clause claims were not "per se non-justiciable." *Kerr I*, 744 F.3d at 1175-76. But *Rucho* made clear this reading was incorrect and held that Guarantee Clause claims are per se non-justiciable. 139 S. Ct. at 2506 (citing *Pac. States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912) (dismissing both Art. IV, Sec. 4 and Oregon's Enabling Act guarantee clause-based claims as nonjusticiable)). This separate basis bars Plaintiffs' constitutional and statutory claims.

## CONCLUSION

*Rucho* bars federal court consideration of Guarantee Clause claims because they are nonjusticiable. *City of Hugo* requires that for a political subdivision to have standing to bring a federal statutory claim, that statute must create enforceable rights for that political subdivision. Because the Enabling Act only addresses "the people" and not political subdivisions, it does not fall within the *City of Hugo*

requirements. Plaintiffs do not therefore have standing to bring their claims.

The Governor respectfully requests that the Court grant rehearing en banc to address the conflict between the panel's opinion and *City of Hugo* and *Rucho*.

Respectfully submitted this 4th day of September, 2019.

PHILIP J. WEISER
Attorney General

_s/ Eric R. Olson_
ERIC R. OLSON*
MEGAN PARIS RUNDLET*
KATHLEEN SPALDING*
STEPHANIE LINDQUIST
  SCOVILLE*
MICHAEL KOTLARCZYK*
Colorado Department of Law
Ralph L. Carr Colorado Judicial
  Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000
eric.olson@coag.gov
megan.rundlet@coag.gov
kit.spalding@coag.gov
stephanie.scoville@coag.gov
mike.kotlarczyk@coag.gov

*Attorneys for Defendant-Appellee
Jared Polis, Governor of Colorado*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32 and Tenth Circuit R. 32 because it uses 14-point Century Schoolbook font, a proportionally spaced typeface.

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,675 words, excluding the parts exempted under Fed. R. App. P. 32(f).

*s/ Michael Kotlarczyk*
_____
Dated September 4, 2019

## CERTIFICATE OF DIGITAL SUBMISSION

No privacy redactions were necessary. The additional hard copies required to be submitted are exact duplicates of this digital submission. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Windows Sensor, Version 5.15.9601.0, which was updated on August 20, 2019, and according to that program is free of viruses.

*s/ Michael Kotlarczyk*
_____
Dated September 4, 2019

**CERTIFICATE OF SERVICE**

This is to certify that, on this 4th day of September, 2019, I have provided electronic service of this GOVERNOR'S PETITION FOR REHEARING EN BANC upon all parties below via email through the CM/ECF system:

David Evans Skaggs
Dentons US LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
david.skaggs@dentons.com
*Attorneys for Plaintiffs-Appellants*

Michael F. Feeley
Sarah M. Mercer
Carrie E. Johnson
Cole J. Woodward
Brownstein Hyatt Farber Schreck LLP
410 17th St., Suite 2200
Denver, CO 80202-4437
mfeeley@bhfs.com
smercer@bhfs.com
cjohnson@bhfs.com
cwoodward@bhfs.com
*Attorneys for Plaintiffs-Appellants*

Herbert Lawrence Fenster Mark Neuman-Lee
Shannon Tucker
Covington & Burling LLP 850 10th St. NW
Washington, DC 20001
hfenster@cov.com
mneumanlee@cov.com
srtucker@cov.com
*Attorneys for Plaintiffs Appellants*

John A. Herrick
2715 Blake Street, #9
Denver, CO 80205
John.herrick@outlook.com
*Attorney for Plaintiffs-Appellants*

Shannon Wells Stevenson
Davis Graham & Stubbs
1550 17th Street, Suite 500
Denver, CO 80202
Shannon.stevenson@dgslaw.com
*Attorney for Amici Curiae*

Cody J. Wisniewski
Mountain States Legal
Foundation
2596 South Lewis Way
Lakewood, CO  80227
cody@mountainstatesleg
al.com
*Attorney for Amici
Curiae*

*/s/ Xan Serocki*

FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**July 22, 2019**

**UNITED STATES COURT OF APPEALS**

**Elisabeth A. Shumaker**
**Clerk of Court**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| ANDY KERR, Colorado State Representative; NORMA V. ANDERSON; JANE M. BARNES, member Jefferson County Board of Education; ELAINE GANTZ BERMAN, member State Board of Education; ALEXANDER E. BRACKEN; WILLIAM K. BREGAR, member Pueblo District 70 Board of Education; BOB BRIGGS, Westminster City Councilman; BRUCE W. BRODERINS, member Weld County District 6 Board of Education; TRUDY B. BROWN; JOHN C. BUECHNER, Ph.D., Lafayette City Councilman; STEPHEN A. BURKHOLDER; RICHARD L. BYYNY, M.D.; LOIS COURT, Colorado State Representative; THERESA L. CRATER; ROBIN CROSSAN, member Steamboat Springs RE-2 Board of Education; RICHARD E. FERDINANDSEN; STEPHANIE GARCIA, member Pueblo City Board of Education; KRISTI HARGROVE; DICKEY LEE HULLINGHORST, Colorado State Representative; NANCY JACKSON, Arapahoe County Commissioner; CLAIRE LEVY, Colorado State Representative; MARGARET MARKERT, Aurora City Councilwoman, a/k/a Molly Markert; MEGAN J. MASTEN; MICHAEL MERRIFIELD; MARCELLA L. MORRISON, a/k/a Marcy L. Morrison; JOHN P. MORSE, Colorado State Senator; PAT NOONAN; BEN PEARLMAN, Boulder County Commissioner; | No. 17-1192 |

WALLACE PULLIAM; FRANK
WEDDIG, Arapahoe County
Commissioner; PAUL WEISSMANN;
JOSEPH W. WHITE; CHEYENNE
WELLS RE-5 SCHOOL DISTRICT
BOARD OF EDUCATION; SUSAN
LONTINE; DENVER COUNTY PUBLIC
SCHOOLS BOARD OF EDUCATION;
K.C. BECKER; BOARD OF COUNTY
COMMISSIONERS OF BOULDER
COUNTY; BOULDER VALLEY
SCHOOL DISTRICT RE-2 BOARD OF
EDUCATION; GUNNISON COUNTY
METROPOLITAN RECREATION
DISTRICT; LESLIE HEROD; PUEBLO
CITY DISTRICT 60 BOARD OF
EDUCATION; CHRISTOPHER J.
HANSEN; GUNNISON WATERSHED
RE-IJ SCHOOL DISTRICT BOARD OF
EDUCATION; COLORADO SPRINGS
DISTRICT 11 BOARD OF EDUCATION;
POUDRE SCHOOL DISTRICT BOARD
OF EDUCATION; PUEBLO COUNTY
SCHOOL DISTRICT 70 BOARD OF
EDUCATION; WILLIAM G.
KAUFMAN,

       Plaintiffs - Appellants,

v.

JARED POLIS, Governor of Colorado in
his official capacity,*

       Defendant - Appellee.

---

     * When the action began, the Governor of Colorado was John Hickenlooper.
While this action was pending, on January 8, 2019, Jared Polis became the governor
of Colorado.  Because the Governor is sued in his official capacity, we substitute
Governor Polis for Governor Hickenlooper per Fed. R. App. P. 43(c)(2).

------------------------------

COLORADO ASSOCIATION OF
SCHOOL BOARDS AND COLORADO
ASSOCIATION OF SCHOOL
EXECUTIVES; THE COLORADO
UNION OF TAXPAYERS
FOUNDATION; MOUNTAIN STATES
LEGAL FOUNDATION,

     Amici Curiae.

-------------------------------------

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-01350-RM-NYW)**

-------------------------------------

David E. Skaggs, Dentons US LLP, Denver, Colorado (Lino S. Lipinsky de Orlov,
Dnetons US LLP, Denver, Colorado, Herbert Lawrence Fenster and Shannon Tucker,
Covington & Burling LLP, Washington, D.C., Michael F. Feeley, Sarah M. Clark, Carrie
E. Johnson, and Cole J. Woodward, Brownstein Hyatt Farber Schreck LLP, Denver,
Colorado, and John A. Herrick, Denver Colorado, with him on the briefs), for Plaintiffs-
Appellants.

Frederick R. Yarger, Solicitor General (Cynthia H. Coffman, Attorney General, Glenn E.
Roper, Deputy Solicitor General, Megan Paris Rundlet, Assistant Solicitor General,
Kathleen Spalding, Senior Assistant Attorney General, Stephanie Lindquist Scoville,
Senior Assistant Attorney General, and Matthew D. Grove, Assistant Solicitor General,
with him on the brief), Office of the Attorney General for the State of Colorado, Denver,
Colorado, for Defendant-Appellee.

Shannon Wells Stevenson and Kyle W. Brenton, Davis Graham & Stubbs LLP, Denver,
Colorado, filed an Amici Curiae brief in support of Plaintiffs-Appellants.

Steven J. Lechner and Cody J. Wisniewski, Mountain States Legal Foundation,
Lakewood, Colorado, filed an amici brief in support of Defendant-Appellee.

-------------------------------------

Before **BRISCOE**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

-------------------------------------

**SEYMOUR**, Circuit Judge.

_____

This case has a long history. The issue currently before us is whether certain school districts, a special district board, and/or a county commission have standing to challenge Colorado's Taxpayer Bill of Rights ("TABOR"). Colo. Const. art. X, § 20. TABOR allows the people of Colorado to raise or prevent tax increases by popular vote, thereby limiting the power of Colorado's legislative bodies to levy taxes. On a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the district court held that plaintiffs had Article III standing but that they lacked political subdivision standing and prudential standing. Accordingly, the court dismissed the complaint. Plaintiffs appeal.

This case is rife with difficult issues, and we applaud the district court for its attempts to "don waders" and generate some cognizable structure out of the sludge. Nevertheless, we conclude that it could not properly reach its conclusions at this stage of litigation. Because we hold that the political subdivision plaintiffs are not barred by standing requirements, we reverse.

I.

Plaintiffs contend that TABOR denies them a "republican form of government" as guaranteed by Congress in the Colorado Enabling Act, ch. 139, 18 Stat. 474 (1875) ("Enabling Act"), because it takes power from the legislature and puts it into the hands of the people of Colorado in violation of the Guarantee Clause, *see* U.S. Const. art. IV, § 4,

4

and the Enabling Act as enforced by the Supremacy Clause, *see* U.S. Const. art. VI, § 2. In one of our prior opinions, we held that certain individual legislator plaintiffs had standing to make this claim and that the claim was not a nonjusticiable political question. *See Kerr v. Hickenlooper*, 744 F.3d 1156, 1161 (10th Cir. 2014) ("*Kerr I*"). On appeal, the Supreme Court vacated and remanded the matter to us for further consideration in light of its opinion in *Arizona State Legislature v. Arizona Indep. Redistricting Com'n*, 135 S. Ct. 2652 (2015). *See Hickenlooper v. Kerr*, 135 S. Ct. 2927 (2015).

On remand, we held that the individual legislator plaintiffs lacked standing because they were asserting an institutional injury. *Kerr v. Hickenlooper*, 824 F.3d 1207, 1211 (10th Cir. 2016) ("*Kerr II*"). We instructed the district court to determine whether any other plaintiffs had standing. Back at the district court, plaintiffs amended their complaint to add certain additional entities: eight school boards, the Board of County Commissioners of Boulder County, and a special district board. As noted, the district court thereafter dismissed the complaint.

TABOR prevents the state legislature and local entities from enacting new taxes or raising taxes except by popular vote. Particularly significant to plaintiffs in this case, TABOR *prohibits* state and local governments from appropriating revenue in excess of the prior year's spending, and it *requires* the state and local governments to refund taxpayers for revenues appropriated in excess of the prior year's spending. Colo. Const. art. X, § 20(7)(a) & (d). TABOR also causes plaintiffs to incur costs from presenting matters to voters. Plaintiffs allege that these requirements inhibit them from performing

their mandated responsibilities under Colorado law.  *See, e.g.*, Colo. Const. art. XIV.[1]

As a condition of admitting Colorado to the Union, Congress required that the state's constitution "shall be republican in form."  18 Stat. 474.  This language mimics the language from the Guarantee Clause of the United States Constitution.  *See* U.S. Const. art. IV, § 4.  Under the Supremacy Clause, federal law controls when federal and state law are in conflict with one another.  U.S. Const. art. VI, § 2.  Plaintiffs contend that TABOR denies them the republican form of government required of the state of Colorado by the Enabling Act and is thus unconstitutional under the Supremacy Clause.

## II.

We review the district court's "dismissal for lack of standing de novo, applying the same standard used by the district court."  *Petrella v. Brownback*, 697 F.3d 1285, 1223 (10th Cir. 2012) (internal quotation marks omitted).  "[A]s in all standing inquiries, the critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction."  *Horne v. Flores*, 557 U.S. 433, 445 (2009) (emphasis in original); *see also Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).  Thus, if at least one plaintiff can demonstrate standing, we need not consider

---

[1] In Colorado, the burden of adopting budgets and funding government programs falls on the representatives of the state, including plaintiffs in this case. *See* Colorado Territorial Act of 1861, ch. 59, 12 Stat. 176 §§ 4, 6, 7; Enabling Act §§ 3, 4; Colo. Rev. Stat. § 30-11-103 (2017) (county governments); Colo. Rev. Stat. § 30-11-101 (2017) (special districts).

standing for the other plaintiffs.  The district court determined that the political

subdivision plaintiffs established Article III standing and defendants do not contest

this conclusion on appeal.  Even so, the district court dismissed the action for lack of

subject matter jurisdiction because it concluded that two independent doctrines

barred these plaintiffs: political subdivision standing and prudential standing.  The

issue before us is whether these other limitations indeed preclude the political

subdivision plaintiffs from establishing standing.


III.

We begin by determining whether there are "prudential standing" limitations

preventing plaintiffs from challenging TABOR.  Plaintiffs argue that in light of the

Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

U.S. 118 (2014), the district court erred in examining these prudential concerns on a Rule

12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[2]  We agree.  In

---

[2] Defendant argues that we should review plaintiffs' prudential standing arguments only for plain error because they failed to argue prudential standing in district court.  *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("[I]f the theory simply wasn't raised before the district court, we usually hold it forfeited.").  We disagree.  Plaintiffs raised prudential standing arguments in their brief in opposition to defendants' motion to dismiss before the district court.  *See* Aplt. App. at 1489–90.  In doing so, they specifically addressed *Lexmark* and the three principles implicated in prudential standing, "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 125.

*Lexmark*, the Supreme Court described the label "prudential standing" as "misleading" and "inapt."[3]  *See id.* at 125, 127 n.3.  "Although the jurisprudence surrounding standing and jurisdiction has at times been muddled, we have clearly held that prudential standing is not a jurisdictional limitation . . . ."  *Niemi v. Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014) (citing *Wilderness Soc. v. Kane Cnty.*, 632 F.3d 1162, 1168 n.1 (10th Cir. 2011) (en banc)).  Accordingly, the district court should not have evaluated defendant's motion to dismiss for lack of subject matter jurisdiction on the basis of prudential standing.  *See VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1146 n.4 (10th Cir. 2017).

## IV.

Properly situating the prudential standing inquiry does not complete our analysis.  The district court also found that, independently of prudential standing concerns, the political subdivision plaintiffs are barred by political subdivision standing restrictions.[4]

---

[3]  *Lexmark* made clear that the first two principles previously labelled as prudential standing are not independent jurisdictional hurdles.  *See id*. at 128 n.4 (clarifying that the zone-of-interests test "does not implicate subject matter jurisdiction" but is a question of whether plaintiff has a valid cause of action), 127 n.3 (generalized grievances are "barred for constitutional reasons, not 'prudential' ones").  If the last principle—the limitation on third-party standing—retains any potency at this stage of litigation, that inquiry is inextricably intertwined with the merits of the present case.  *See infra.*

[4] As an initial matter, plaintiffs note in their opening brief that "[it] is not entirely clear whether 'political subdivision standing' should be treated doctrinally as another subcategory of prudential standing."  Aplt. Br. At 9–10.  In the most recent precedential case on point, we acknowledged there is "serious reason to doubt" whether political subdivision standing is a jurisdictional limitation.  *City of Hugo v.*

It is true that political subdivisions generally lack standing to sue their creating state. *Housing Authority of Kaw Tribe of Indians of Oklahoma v. City of Ponca City*, 952 F.2d 1183, 1188 (10th Cir. 1991). But "the Supreme Court and courts of appeals have shied away from erecting an absolute bar." *City of Hugo v. Nichols*, 656 F.3d 1251, 1256 (10th Cir. 2011). In certain circumstances we have held that political subdivisions have standing, and two cases guide our analysis: *City of Hugo,* and *Branson v. Romer*, 161 F.3d 619 (10th Cir. 1998). The district court and plaintiffs differ in their interpretations of the scope of these holdings.[5] Because we conclude

---

*Nichols*, 656 F.3d 1251, 1255 (10th Cir. 2011); *cf.* Brian P. Kennan, *Subdivisions, Standing and the Supremacy Clause: Can a Political Subdivision Sue its Parent State Under Federal Law?*, 103 Mich. L. Rev. 1899 (2005) (noting Supreme Court's precedential "political subdivision standing" cases were actually decided on the merits and not as jurisdictional issues). *City of Hugo* concluded that it was nevertheless bound by this court's prior decision casting the doctrine as one of jurisdictional standing. *Id*. at n.4 (referring to *Branson v. Romer*, 161 F.3d 619 (10th Cir. 1998)).

[5] The dissent agrees with the district court's understanding of *City of Hugo*: the federal statute being enforced must be "directed at protecting political subdivisions." Dissent at 4 (citation omitted). Declaring plaintiffs make "virtually no argument that *if* a 'directed at protecting' requirement applies, it is satisfied," the dissent concludes they have waived this dispositive issue. *Id.* at 7–8 (emphasis in original). But the dissent itself accentuates the key word here: the dispute is "if" such a requirement applies. Plaintiffs' explanation for why the district court is wrong regarding the application of our political subdivision standing precedents is that the district court erred in discerning the applicable legal standard. *See, e.g.*, Aplt. Br. at 26 n.13 ("The District Court erred in concluding that more is needed for a political subdivision to sue. It stretched the *Branson II* Court's *dicta* to impose two additional requirements for political subdivision standing . . . . Beyond granting inappropriate weight to dicta, such requirements represent a broad expansion of precedent that confuses the standing analysis.") (emphasis in original). Nonetheless, plaintiffs' analysis with respect to their satisfaction of the statutory "zone of interests" test also speaks to this "directed at protecting" requirement as it is presented by the district court. They

that under either proffered formulation the district court erred in dismissing these claims on a Rule 12(b)(1) motion, we need not determine the precise reach of these precedents.

Plaintiffs assert the essence of *City of Hugo* and *Branson* is that "a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal law." *Branson*, 161 F.3d at 628. They identify the dispositive question as whether the right sought to be vindicated was "written to protect individual rights, as opposed to collective or structural rights." *Id.* Arguing that the political subdivision plaintiffs here, like those in *Branson*, seek to vindicate federal rights that are statutory, structural and collective rather than constitutional, individual and contractual, they urge the conclusion that as in *Branson* the political subdivision plaintiffs here have standing. The government does not contest that employing this interpretation of our precedents casts the present political subdivision plaintiffs under the precedential force of *Branson* rather than *City of Hugo*. Therefore, if this interpretation of our case law is to be applied, these plaintiffs are not barred by political subdivision standing considerations.

Alternatively, the district court, the government, and the dissent all read *City of Hugo* as requiring that "the federal statute being enforced must be 'directed at

---

have responded to the district court's political subdivision standing analysis sufficiently to avoid waiver.

protecting political subdivisions.'"[6] *Kerr v. Hickenlooper*, 259 F. Supp. 3d 1178,

1188 (D. Colo. 2017) ("*Kerr*") (citing *City of Hugo*, 656 F.3d at 1257).  Scrutinizing

plaintiffs' assertion that "the political-subdivision plaintiffs are seeking to enforce

rights granted to them in the Enabling Act," *id.* at 1188, the district court countered

---

[6] Plaintiffs and the Amici Curiae both raise credible concerns about this rule being drawn from our political subdivision standing precedents.  *City of Hugo*'s analysis focused on whether substantive *constitutional* rights can be the basis for political subdivision standing and did not itself engage in any *statutory* analysis.  Our precedents thus provide no workable standards regarding what language a statute must include for it to be "directed at protecting political subdivisions" or how such a rule should be applied.  *See* Amicus Br. of Colo. Ass'n of Sch. Bds. & Colo. Ass'n of Sch. Execs. at 12.  Moreover, courts are already required to examine whether a plaintiff's claims fall within the "zone of interests" of a federal statute when determining whether that plaintiff has a cause of action, *see Lexmark*, 572 U.S. at 128, and "[s]hoehorning a more stringent requirement for direct statutory protection into the political subdivision analysis would render the Supreme Court's well established zone of interests test superfluous."  Aplt. Br. at 26 n.13.

This reading of *City of Hugo*'s holding is also contrary to two limiting trends of the Supreme Court and lower courts: to limit the doctrine of political subdivision standing, *see City of Hugo*, 656 F.3d at 1265 (Matheson, J., dissenting), and the more recent emphasis on federal courts' "virtually unflagging" obligation to hear and decide cases within their jurisdiction, *see Lexmark*, 572 U.S. at 127 n.3, 128 n.4 (limiting the application of prudential standing doctrines as subject matter jurisdiction inquiries); *see also Susan B. Anthony List v. Driehaus*, ––– U.S. –––, 134 S. Ct. 2334, 2347 (2014) (discussing, but not resolving, prudential ripeness doctrine's tension with the federal courts' "virtually unflagging" obligation); *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1059 n.1 (10th Cir. 2017) (Matheson, J., concurring) (citing Supreme Court's choice not to resolve this tension, but continuing to apply ripeness doctrine as binding precedent), 1076 n.13 (Bacharach, J., concurring) (same); *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018) (citing Supreme Court's choice not to resolve this tension and likewise declining to resolve the continuing vitality of ripeness doctrine).

In declining to determine the proper test for political subdivision standing, we do not resolve these concerns.  Even so, we call attention to them as supplementary support for our holding that these plaintiffs should not have been dismissed on these grounds.

that the Enabling Act's requirement that the Colorado constitution be "republican in form" was not designed for such plaintiffs. Instead, the district court concluded that nearby language in the Enabling Act revealed the requirement of "republican in form" as being granted to "the *people* of Colorado." *Id.* at 1191 (emphasis added). It surmised that the political subdivision plaintiffs had been granted no statutory rights to vindicate this interest, and that they were accordingly barred by political subdivision standing.

But we cannot decisively determine if the political subdivision plaintiffs here are excepted from the usual bar to political subdivision standing because doing so would require impermissibly delving into the merits of the case. Establishing *who* was intended to benefit from the Enabling Act's "republican in form" requirement necessarily begs the question of *what* a "Republican Form of Government" is, which is the issue ultimately to be resolved if any court ever succeeds in reaching the merits of this case. *See Largess v. Supreme Judicial Court for State of Massachusetts*, 373 F.3d 219, 226 (1st Cir. 2004) (proceeding to merits to review scope and meaning of "Republican Form of Government"). Even the district court modulated its conclusion that "republican in form" does not extend rights to the political subdivision plaintiffs by stating that it so finds "based on the present record." *Kerr*, 259 F. Supp. 3d at 1190–91. But the present record is insufficient to support this determination.

Throughout their various pleadings, plaintiffs maintain that a "Republican Form of Government" extends protections directly to these political subdivision plaintiffs that TABOR unconstitutionally intrudes upon. They offer several hooks

hinting at their arguments on the merits of the case, including the observations that the Enabling Act recognized the existence of both counties and public schools *prior* to Colorado's statehood, and that the constitution Colorado adopted pursuant to the Enabling Act embodied an interdependent structure between the state and its existing political subdivisions. *See* Aplt. Reply Br. at 21 n.13.[7]  Notably, plaintiffs allege that a "fully effective legislature is an essential component of a Republican Form of Government," and that the TABOR Amendment's substantial interference with the Colorado General Assembly's taxing power "renders [it] unable to fulfill its legislative obligations . . . .  [and] similarly undermines the Republican Form of Government for all subordinate levels of government in the state."  Aplt. App. at 1447 (Complaint at ¶108).  They further argue that a "Republican Form of Government" *necessarily* extends to each lower level of government because acceptance of the contrary would beget complete evasion of this requirement through the delegation of powers to subordinate levels of government that were not equally

---

[7] *See also, e.g.*, Aplt. Br. at 7–8 ("[T]he requirement for a 'republican form of government' applies not only on the state government but also to the state's local governments.  The Enabling Act, together with the Colorado Constitution enacted in compliance with the requirements of the Enabling Act, created an integrated structure of government. . . ."), *id.* at 27 n.15 ("Colorado's Constitution established a republican form of government that was grounded in a structure that embodied a purposeful interdependence between the state and its political subdivisions. The Constitution expressly considered school boards and county governments. . . . The historic existence of the Political Subdivision Plaintiffs is of a piece with Colorado's republican form of government and its origins."), *id.* at 36 ("From its outset, and presumably inherent in its acceptance into the Union, the Colorado Constitution's guarantee of a republican government entailed an interdependent relationship between state government and local political subdivisions with the inherent authority to raise and spend revenue.").

"republican in form." *Id.* at 1424 (Complaint at ¶11). Plaintiffs have informed us that their case on the merits "will offer extensive historical evidence of and legal proof for the proper meaning of the Guarantee Clause and 'Republican Form of Government.'" Aplt. Reply Br. at 25 n.15.

In response, both the government and the district court valiantly struggle to *conclusively* establish that the political subdivision plaintiffs are *not* the beneficiaries of a "Republican Form of Government." They extend various conjectural standards in doing so, including that the constitutional guarantee of a republican form of government is a guarantee to the *state* that does not extend to individuals, Aple. Br. at 20,[8] and that this guarantee is to the *people* of the state, *Kerr*, 259 F.Supp. 3d at

---

[8] Tellingly, one of the cases the government cites for this proposition is *Largess*, in which the First Circuit explicitly decided it could *not* deny individuals standing under the Guarantee Clause because the standing issue was "intertwined and inseparable from the merits of the underlying claim." *Largess*, 373 F.3d at 224. The underlying claim was that the Guarantee Clause extends rights to individuals in at least some circumstances and the First Circuit footnoted the clarification that "the Guarantee Clause makes the guarantee of a republican form of government to *the states*; the bare language of the Clause does not directly confer any rights on individuals." *Id*. at 225 n.5. Notwithstanding this skepticism as to whether individuals would ever have enforceable rights under the Guarantee Clause, the First Circuit held that plaintiffs had standing. It *then* proceeded to analyze the Guarantee Clause and ultimately hold that the *Largess* plaintiffs did not have enforceable rights under the Guarantee Clause, leaving open the question whether any individuals could ever have enforceable rights under the Guarantee Clause. *See generally id*. at 226–229. Critically for our analysis, the First Circuit's review of the scope of the "Republican Form of Government" guarantee did not take place until *after* the recognition that this particular question was interwoven into the initial standing inquiry. Here, in contrast, the merits of the case are not before us.

The dissent's efforts to distinguish this case as irrelevant are unconvincing. Although the standing inquiries in *Largess* and our case differ, the nature of these inquiries are equally intertwined with the merits in both cases.

1191.  Citing a variety of reasons, the district court declared it "does not believe" that the requirement of a Constitution "republican in form" stretches to the political-subdivision plaintiffs.  But each proposed rationale is insufficient to extricate the standing inquiry from the case on the merits, which is not presently before us on this appeal from the grant of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).  *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc) ("For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation. That is the issue on the merits. For standing purposes, we ask only if there was an injury in fact, caused by the challenged action and redressable in court."), *cert. denied*, 549 U.S. 1245 (2007); *Day v. Bond*, 500 F.3d 1127, 1137 (10th Cir. 2007) ("'For purposes of standing,' we noted [in *Walker*], 'the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest,' because that would be a determination of the merits of the plaintiffs' claim under the guise of an evaluation of their standing.").

The district court forged on, concluding that "the political subdivision plaintiffs cannot be seeking to enforce a right to a Constitution 'republican in form' because they have no such right" and it "is not their injury to assert."  *Kerr*, 259 F. Supp. 3d at 1191, 1192.  This conclusion is problematic for two reasons: first, to some extent it contradicts the court's earlier finding that the political subdivision plaintiffs have personally suffered a concrete injury directly at the hand of TABOR; second, and more importantly, this is now dabbling in the merits of this case.

Granted, we have previously explained that "the term 'legally protected interest' must do some work in the standing analysis ... [and] has independent force and meaning, without any need to open the door to merits considerations at the jurisdictional stage." *Walker*, 450 F.3d at 1093. We have not explained what that independent force and meaning are but, in any event, the present case falls nowhere near the illustrative list of situations we provided in which an asserted "legally protected interest" is not recognized.[9]

The district court cited *Day* to try to unwind the merits from the jurisdictional issue, stating that the standing issue of whether political subdivision plaintiffs "are enforcing rights granted to them by the Enabling Act" is "a completely different inquiry to whether a Republican form of government has been undermined by TABOR." *Kerr*, 259 F. Supp. 3d at 1192. But the distinction between these two inquiries dissolves when traced back to the root question: both inquires require *first* determining the meaning and purpose of the phrase "republican in form." The standing question and merit question here are not two separate and independent issues, analogous to *Day*, but are instead comparable to *Walker:* the merits of the plaintiffs' claims mirror the standing inquiry as it is framed by the district court. *See*

---

[9] "For example, a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected. A person suing to require enforcement of the law against his neighbor lacks standing, even if he is adversely affected by his neighbor's conduct, because no one has a legally protected interest in the prosecution of another. Finally, a plaintiff whose claimed legal right is so preposterous as to be legally frivolous may lack standing on the ground that the right is not legally protected." *Walker*, 450 F.3d at 1093 (internal quotation marks and citations omitted).

16

*Day*, 500 F.3d at 1138. "[T]he circumstances of this case present a rare instance in which the standing issue is intertwined and inseparable from the merits of the underlying claim." *Largess*, 373 F.3d at 224; *see also Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005) ("The underlying issue in determining whether the jurisdictional question is intertwined with the merits is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.") (internal brackets and citation omitted); *Sizova v. Nat. Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002) ("[S]ubject matter jurisdiction and the merits are considered to be intertwined when subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case.") (internal brackets, quotation mark, and citation omitted); [10] *cf.* Kennan, *supra* note 4 (arguing that questions of whether political subdivisions should be barred from bringing suit because it would impede state sovereignty can

---

[10] The dissent believes that political subdivision standing requires a searching analysis of the relevant federal statute's intended beneficiaries "as part of a *threshold jurisdictional standing* inquiry . . . . [i]rrespective of whether this may sometimes resemble a merits analysis." Dissent at 12 (emphasis in original). However, this ignores our cases recognizing that it is sometimes appropriate to decide a jurisdictional issue at a later stage in the proceeding if that issue is intertwined with the merits of the case. In the same manner, it is noteworthy that even where our precedents cast the political subdivision standing doctrine as jurisdictional, they address it at later stages in litigation and with access to considerably more information than entailed by the Rule 12(b)(1) motion here. *See City of Hugo*, 656 F.3d at 1254 (district court granted summary judgment); *Branson*, 161 F.3d at 627 (district court held hearing on plaintiffs' request for preliminary injunction, then issued "very careful and thorough opinion" following cross-motions for summary judgment).

only be determined by addressing the merits of the subdivision's claims that state action violates the Supremacy Clause).

The various conclusions the district court and parties draw regarding "republican in form" are not of most interest to our analysis. Rather, it is the attempt itself which betrays the fundamental hitch—that these standing arguments turn on the merits of plaintiffs' claims, namely the meaning, scope, and intended beneficiaries of the Enabling Act's requirement that Colorado's constitution be "republican in form." *See* Aplt. Reply Br. at 24. We are not commenting on the validity or weight of any of these arguments but merely highlighting the degree of uncertainty present at this stage. *See Schramm v. Oakes*, 352 F.2d 143, 149 (10th Cir. 1965) (holding standing inquiry to be intertwined with the merits because "[b]ased then on what we have, we are unable to say with any degree of legal certainty that the appellants could not make out a valid cause of action"). The merits of these issues were not presented to the district court and are not before us. We thus cannot say with confidence what is entailed by the Enabling Act's requirement for a government "republican in form," and neither can we say with confidence what is not.

This uncertainty is particularly apparent when we examine the paucity of jurisprudence concerning the scope and meaning of guarantees to a "Republican Form of Government." As tellingly described by the First Circuit,

> scholars have interpreted this [republican form of government] portion of the Guarantee Clause in numerous, often conflicting, ways. And John Adams himself, twenty years after ratification of the Constitution, confessed that he "never understood" what the Guarantee Clause meant and that he "believ[ed] no man ever did or ever will."

*Largess*, 373 F.3d at 226–27 (citations omitted); *see also* Aplt. Reply Br. at 16 n.7 (citing *Minor v. Happersett,* 88 U.S. 162, 175–77 (1874)).  There can be no doubt that disentangling these answers will be an immense task; however, this is not a task to be undertaken on a Rule 12(b)(1) motion such as this.

 We sympathize with the reality that "standing doctrine sometimes has a frustratingly metaphysical quality." *Walker*, 450 F.3d at 1097.  But "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc.*, 572 U.S. at 126; *see also Odom v. Penske Truck Leasing Co., L.P.*, 893 F.3d 739, 743 (10th Cir. 2018) (citing *Lexmark* to construe prudential restraints narrowly).  Irrespective of whether or not a republican form of government is eventually found to be guaranteed to these particular plaintiffs, the district court cannot properly reach this issue as a jurisdictional matter.  Because these political subdivision plaintiffs have Article III standing and cannot be *irrefutably* barred by alternative standing doctrines, the district court should not have dismissed the complaint for a lack of subject matter jurisdiction.

 We REVERSE and REMAND to the district court for further proceedings.

17-1192, *Kerr v. Polis*

**HOLMES**, Circuit Judge, dissenting.

I respectfully dissent. Unlike the majority, I would affirm the district court's judgment based on the political-subdivision standing doctrine. For the political-subdivision plaintiffs ("Plaintiffs") to have standing, our decision in *City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011), requires that they seek to enforce a federal statute directed at protecting or specifically providing rights to political subdivisions (sometimes referred to collectively herein as the "directed at protecting" requirement). The district court ruled against them on this dispositive issue, and their argument challenging that ruling is so meager as to constitute waiver. Moreover, their argument—insofar as I am able to piece it together—also fails on the merits. The majority truncates its analysis before reaching these issues, ruling that doing so would require "impermissibly delving into the merits of the case." Maj. Op. at 12. However, our prior cases counsel that a court must consider those issues in answering the threshold question of standing and that it may do so without impermissibly implicating the merits. Accordingly, I respectfully dissent.

As we observed in *Branson School District RE–82 v. Romer*, 161 F.3d 619 (10th Cir. 1998), it is "well-settled" in this circuit that a political subdivision "may not bring a federal suit against its parent state" on the basis of certain constitutional provisions. *Id.* at 628. However, *Branson* also described

limitations on this bar: notably, it suggested that the bar applies only "when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Id.* In particular, the *Branson* court was unable to locate any Supreme Court decision barring a subdivision from asserting "the structural protections of the Supremacy Clause . . . against its creating state." *Id.* at 629.

The political-subdivision plaintiffs in *Branson* (Colorado school districts) brought just such a viable challenge, primarily to state constitutional changes modifying the terms under which a state land board would manage its holdings. *Id.* at 627. Specifically, the land board was no longer required to manage its holdings to secure the "maximum possible amount" for a public school fund; rather, the board was simply required to manage its holdings to "produce reasonable and consistent income over time." *Id.* The plaintiffs challenged these changes "under the Supremacy Clause and the Colorado Enabling Act," and the *Branson* court concluded that the challenge could proceed. *Id.* at 629; *see also id.* at 630 ("[O]ur holding simply allows a political subdivision to sue its parent state when the suit alleges a violation by the state of some controlling federal law. The Supremacy Clause guarantees no less."). In reaching this conclusion, *Branson* noted that the plaintiffs were both "substantially independent" of the state of Colorado and, "[m]ost importantly," they were "'essentially' the beneficiaries of

2

the federal trust at issue." *Id.* at 629. That is, the Enabling Act had granted millions of acres of "school lands" to the State of Colorado for "the support of the 'common schools,'" and "[t]oday's public school districts are the direct political descendants of those 19th Century 'common schools.'" *Id.*

Nearly thirteen years later, our court decided *City of Hugo*. There, we observed that the Supremacy Clause is not itself the source of any federal rights; instead, it secures federally protected rights when they conflict with state law. 656 F.3d at 1256. As such, "a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some *other* federal law, which trumps a contrary state law by operation of the Supremacy Clause." *Id.* After summarizing our case law regarding political-subdivision standing (including *Branson*), *City of Hugo* was unable to find "a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution." *Id.* at 1257. "Instead, courts have allowed such suits only when Congress has enacted statutory law *specifically providing rights to* municipalities." *Id.* (emphasis added); *see also id.* (harmonizing prior cases finding standing and observing that, in those cases, "the source of substantive rights was a federal statute *directed at protecting political subdivisions*, and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law"

3

(emphasis added)).  Because the claims in *City of Hugo* were based on a substantive provision of the Constitution, i.e., the dormant Commerce Clause, and because "the Constitution does not contemplate the rights of political subdivisions as against their parent states," standing was lacking.  *Id.* at 1257–58.

Here, political subdivisions of the State of Colorado challenge Colorado's Taxpayer Bill of Rights ("TABOR") under the Colorado Enabling Act and the Supremacy Clause, contending that TABOR contradicts the Enabling Act's requirement that Colorado maintain a "republican form of government."[1]  *See* Aplts.' App., Vol. XII, at 1424, 1426, 1448 (Fourth Am. Compl., filed Dec. 6, 2016).  The district court analyzed the case under *Branson* and *City of Hugo*, ruling that the Plaintiffs did not establish that they were seeking to enforce "any rights granted to them under the Enabling Act."  *Id.* at 1575–84 (Op. & Order, dated May 4, 2017); *see id.* at 1578 ("*City of Hugo* explains that the federal statute being enforced must be 'directed at protecting political subdivisions.'" (quoting *City of Hugo*, 656 F.3d at 1257)).  The district court reviewed several paragraphs of the Fourth Amended Complaint that the Plaintiffs had cited,

---

[1]     Although the Fourth Amended Complaint alleges that TABOR also runs afoul of other laws, e.g., the federal Constitution's analogous Guarantee Clause and Colorado's state constitution, Aplts.' App., Vol. XII, at 1447–49, the Plaintiffs' political-subdivision standing arguments are premised on the Enabling Act and Supremacy Clause, Aplts.' Opening Br. at 24–25.

concluding that most of these paragraphs simply made "no mention of rights being granted in the Enabling Act to the [Plaintiffs]." *Id.* at 1579.

In the district court's view, the Fourth Amended Complaint's only "potentially relevant paragraphs" were Paragraphs 30 and 34. *Id.* at 1580. Paragraph 30 contended that the Enabling Act required "use of, and revenue from, the federal lands ceded to the State upon admission as a state to be dedicated to 'the support of common schools' (Section 7), 'support of a State university' (Section 10), and 'the two sections of land in each township herein granted for the support of common schools . . . the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of common schools' (Section 14)." *Id.* at 1430 (omission in original). And, according to Paragraph 34, TABOR prevents "the State and its local school districts from fulfilling their obligations, derived from the original state constitution, and its derivation from the Enabling Act, adequately to fund the public schools of the State." *Id.* at 1431.

The district court concluded that these allegations were insufficient to establish standing. Preliminarily, the district court ruled that none of these provisions provided any succor to Plaintiffs *not* associated with public schools, i.e., boards of county commissioners or special districts. *See id.* at 1580. It also observed that the briefing on this issue was limited, and that the Plaintiffs

5

"ma[d]e no effort" to explain how the cited paragraphs of the Fourth Amended Complaint, and the authorities therein, gave rise to standing. *Id.* Moreover, the district court rejected the Plaintiffs' reliance on Section 10 of the Colorado Enabling Act because none of them are state universities, and it rejected the Plaintiffs' allegations concerning Sections 7 and 14 of the Enabling Act as inapposite. *See id.* at 1581–82. That is, while Sections 7 and 14 concern "support of common schools," they do not implicate the right to a "republican form of government" sought to be enforced here; in other words, unlike the suit brought in *Branson*, this suit does not directly concern the land-trust and funding issues addressed by these provisions of the Enabling Act. *See id.* The district court also observed that, although the Enabling Act *does* expressly contemplate a state constitution that is "republican in form," the Enabling Act counsels that such a constitution is for "the people of [Colorado]," *see* 18 Stat. 474 §§ 4–5 (1875), with no specific mention of political subdivisions. Aplts.' App., Vol. XII, at 1583.

On appeal, the Plaintiffs contend that their suit passes muster under *Branson*, and indeed is more like that case than like *City of Hugo*, because they seek to vindicate *structural* rights, not *individual* ones. Aplts.' Opening Br. at 23. In a footnote, they argue that the district court impermissibly "stretched" dicta in *Branson* (not *City of Hugo*) to require that they sue to enforce a statute "directed

6

at protecting political subdivisions." *Id.* at 26 n.13.  They also contend that *City of Hugo* is distinguishable because the claim in *City of Hugo* was "an 'individual' claim under the terminology of *Branson*" and that their claim is distinct from that in *City of Hugo* because their claim relies on a federal statute (the Enabling Act), rather than a substantive constitutional provision.  *Id.* at 23, 28–30.

I would reject any argument that *City of Hugo* is inapplicable.  While it is true that *City of Hugo* directly addressed enforcement of the dormant Commerce Clause, *City of Hugo* expressly distinguished that claim from one where "the source of substantive rights was a federal statute *directed at protecting*" or "*specifically providing rights to*" political subdivisions, and, critically, it observed that our cases (and, indeed, all the Supreme Court and court of appeals cases it could find) have allowed political-subdivision standing only in the presence of the latter showing.  *See* 656 F.3d at 1257 (emphases added).  *City of Hugo* also opined that "*Branson* simply cannot be read to embrace the notion that use of the terms 'collective' and 'structural' meant to refer to anything other than the situation where a political subdivision has brought suit against its parent to vindicate substantive federal statutory rights through the Supremacy Clause."  *Id.* at 1262.  Thus, our most recent comprehensive exploration of this issue, *City of Hugo*, requires a political-subdivision plaintiff's "structural" claim to be undergirded by a statute providing it with rights to enforce.

7

Because *City of Hugo* applies, the Plaintiffs must seek to enforce a federal statute "directed at protecting political subdivisions" or "specifically providing rights to" them. *Id.* at 1257. Having trained its attention on distinguishing *City of Hugo*, however, the Opening Brief makes virtually no argument that this "directed at protecting" requirement is satisfied. Instead, the Opening Brief generally reiterates the nature of the Plaintiffs' claims, i.e., they "allege that TABOR violates the provision of the Enabling Act requiring a republican form of government, and that such violation is actionable against the state under the Supremacy Clause," Aplts.' Opening Br. at 24, and they "seek to enforce a claim under the Enabling Act: the right to a republican form of government," *id.* at 28. In connection with these cursory arguments, the Plaintiffs cite essentially the same paragraphs of the Fourth Amended Complaint that the district court found unavailing; yet, significantly, they offer no explanation as to why the district court's analysis of the legal import of these paragraphs was wrong. *See id.* at 24, 28. In light of this limited argument, I would deem the issue waived. *See, e.g.*, *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) (citing "well-settled" principle that "[a]rguments inadequately briefed in the opening brief are waived" (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998))); *see also Reedy v. Werholtz*, 660 F.3d 1270, 1275 (10th Cir. 2011) ("The

8

argument section of Plaintiffs' opening brief does not challenge the court's reasoning on this point.  We therefore do not address the matter.").

In any event, the limited argument that I can discern is unavailing.  It seems that, in the Plaintiffs' view, *Branson* establishes that political-subdivision standing is broadly available for claims under the Enabling Act, and they are simply following the trail blazed in that case:  "Here, as in the *Branson* litigation, the [Plaintiffs] claim the protections afforded under a federal statute, the Enabling Act, which imposes the *structural* requirement that Colorado's government be 'republican in form.'"  Aplts.' Opening Br. at 24; *see also id.* at 27 ("That same Enabling Act conditioned Colorado's admission into the Union upon its enactment of a constitution that was 'republican in form.'").  But the Plaintiffs elide a key distinction relied upon by the district court and consistent with both *Branson* and *City of Hugo*: the issues in *Branson* directly implicated *specific* provisions of the Enabling Act providing lands "for the support of the 'common schools,'" of which the school-district plaintiffs were "direct political descendants."  161 F.3d at 629.  Indeed, *Branson* deemed it "[m]ost important[]" that the school districts were "essentially" the beneficiaries of the land trust that had been affected by state constitutional changes.  *Id.*  Here, in contrast and as the district court correctly observed, there is no similarly close link between the "republican form of government" that the Plaintiffs claim TABOR contravenes and the land-

9

management and funding issues addressed in the provisions of the Enabling Act that the Plaintiffs cited in their Fourth Amendment Complaint and continue to rely on. *See* Aplts.' App., Vol. XII, at 1581–82. I also agree with the district court that, to the extent that the Enabling Act expressly requires a republican form of government, it does not suggest that the requirement is directed at protecting or specifically providing rights to Colorado's political subdivisions. *Id.* at 1582–83.

Our political-subdivision standing cases require a plaintiff to show that its claims are undergirded by a federal statute directed at protecting or providing rights to it. The Plaintiffs have not satisfied this standard; indeed, they present very limited argument on this issue and make only feeble challenges to the district court's ruling. Because the political-subdivision standing bar is an independent jurisdictional bar, I would affirm the district court's ruling solely on this basis. *Cf. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007) (holding that federal court could dismiss case on *forum non conveniens* grounds without conclusively deciding issues of subject-matter jurisdiction).

The majority makes a different determination, opining that the district court "could not properly reach its conclusions at this stage of litigation." Maj. Op. at 4. Before I discuss my reasons for diverging from the majority's views, I note several issues which are left unresolved by the majority's opinion. First, although the majority evinces some uncertainty as to whether political-subdivision standing

10

is properly considered a type of "prudential standing"—notably, intimating that *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), may have put in doubt on whether this form of standing is a jurisdictional bar, *see* Maj. Op. at 8-9 n.4, 11 n.6—the majority ultimately follows our prior cases that treat political-subdivision standing as a jurisdictional matter, and it thus analyzes political-subdivision standing entirely separately from prudential standing.  *See City of Hugo*, 656 F.3d at 1255 n.4 (observing that *Branson* "casts the matter [of political-subdivision standing] as one of jurisdictional standing"). Second, although the majority voices concerns about the contours and workability of applying the "directed at protecting" component of *City of Hugo*, it expressly declines to "resolve" these concerns (albeit while citing them as "supplementary support" for its result).  Maj. Op. at 11 n.6.  Third, it declines to determine the "precise reach" of *Branson* and *City of Hugo* or choose definitively between the differing readings offered by the Plaintiffs and the district court because, in its view, "under either proffered formulation the district court erred."  *Id.* at 10.

Instead, the crux of the majority's analysis is that "[e]stablishing *who* was intended to benefit from the Enabling Act's 'republican in form' requirement necessarily begs the question of *what* a 'Republican Form of Government' is, which is the issue ultimately to be resolved if any court ever succeeds in reaching the merits of this case."  *Id.* at 12.  In other words, in the majority's view,

11

grappling with the "directed at protecting" component of *City of Hugo* would require "impermissibly delving into the merits of the case." *Id.* at 12.

I part ways with the majority here. Our cases *do* generally emphasize the importance of distinguishing between the standing inquiry and merits issues, with the latter including the elements of a claim and whether that claim has been successfully stated. *See id.* at 15–16; *see also, e.g.*, *Day v. Bond*, 500 F.3d 1127, 1137 (10th Cir. 2007) ("'For purposes of standing,' . . . 'the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest,' because that would be a determination of the merits of the plaintiffs' claim under the guise of an evaluation of their standing." (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc))). However, the cases the majority relies on do not involve the political-subdivision standing doctrine or the embedded "directed at protecting" requirement. In that context, as I have set forth *supra*, *City of Hugo* is our primary guidepost. That case reiterates that political-subdivision standing is jurisdictional, *see* 656 F.3d at 1255 n.4, and requires a political-subdivision plaintiff to show—as part of a *threshold jurisdictional standing* inquiry—that it seeks enforcement of a federal statute directed at protecting or specifically providing rights to political subdivisions like it, *id.* at 1257. Thus, in analyzing standing in this specific context, *City of Hugo* requires a federal court to analyze

12

the nature of the claim or rights at issue, at least as far as is necessary to determine who may seek to enforce them.  Irrespective of whether this may sometimes resemble a merits analysis, it is precisely what *City of Hugo* contemplates.

I note further that falling back on *Branson* is of no avail to the majority's position: although a "directed at protecting" requirement is not clearly stated in that case, *Branson* still considered and ultimately found "[m]ost important[]" to its analysis the fact that the plaintiffs were "'essentially' the beneficiaries of the federal trust at issue."  161 F.3d at 629.  Thus, our precedent certainly permits, and in my view requires, a court to determine a federal statute's beneficiaries as part of its standing analysis and contemplates that a court may make such a determination without impermissibly implicating the merits.  I respectfully submit that the majority, in concluding otherwise, fails to correctly apply this precedent.  Nor does the majority attempt to persuasively distinguish this precedent, much less demonstrate that it has been superseded by subsequent Supreme Court authority.[2]

---

[2]     I find irrelevant the analysis in *Largess v. Supreme Judicial Court for State of Massachusetts*, 373 F.3d 219 (1st Cir. 2004) (per curiam), which the majority repeatedly cites.  *See* Maj. Op. at 12-14, 13 n.7.  *Largess*'s ostensibly relevant standing analysis, where that panel ruled standing was "intertwined [with] and inseparable from the merits of the underlying claim," concerned whether the plaintiffs shared "an undifferentiated harm with other voters," 373 F.3d at 224, not the political-subdivision standing doctrine.  Of course, this out-

13

Much of the majority's disquiet seems to be based on a perceived lack of "workable standards" and its view that "disentangling" the meaning of "republican form of government" will be an "immense task" not amenable to resolution in the context of a Rule 12(b)(1) motion.  Maj. Op. at 11 n.6, 18; *see also id.* at 12 (stating that these issues cannot be resolved on "the present record" and that the Plaintiffs' briefing "hint[s] at" complex merits arguments concerning the meaning of this phrase); *id.* at 13 (suggesting that the district court and the State "valiantly struggle to *conclusively* establish" that the Plaintiffs are not beneficiaries of a "republican form of government"); *id.* at 17 (citing "the degree of uncertainty present at this stage").  I disagree: as I observed *supra*, the Plaintiffs have made virtually no argument at this stage that, *if* a "directed at protecting" requirement applies, it is satisfied.  *See also id.* at 17 (appearing to acknowledge that arguments concerning the "meaning, scope, and intended beneficiaries" of the "republican in form" requirement "were not presented to the district court and are not before us").  Our political-subdivision standing cases and general standing principles both counsel that it is the Plaintiffs' burden to satisfy this standard.  *See, e.g.*, *Utah Ass'n of Ctys. v. Bush*, 455 F.3d 1094, 1100

---

of-circuit decision also did not purport to apply (and in fact predated) our court's decision in *City of Hugo*, which is binding precedent.

14

(10th Cir. 2006) (observing that party seeking to invoke jurisdiction must establish standing).

Additionally, complexity alone does not permit a court to forestall the full evaluation of jurisdictional issues.  Earlier in this litigation, a panel evaluated the "justiciability hurdle" of the political-question doctrine under a six-factor test, evaluating at length, for example, whether the federal constitutional guarantee of a "republican form of government" is textually committed to another branch, whether judicially discoverable and manageable standards exist for interpreting that guarantee, and whether evaluating the issue requires making policy determinations.  *Kerr v. Hickenlooper*, 744 F.3d 1156, 1172, 1176–81 (10th Cir. 2014), *cert. granted*, *judgment vacated on other grounds*, 135 S. Ct. 2927 (2015); *see also Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004) (observing that "the question of justiciability implicates this court's jurisdiction").  And it did so with special attention to not "reaching or considering the merits."  *See Kerr*, 744 F.3d at 1179.  I see no reason why—if required—a similarly searching analysis might not be undertaken in this context, and similarly fine distinctions might not ultimately be drawn between standing and merits issues, in evaluating *whom* the Enabling Act's requirement of a republican form of government was directed at protecting or specifically providing rights to.

15

To be sure, there may be conceivable arguments for reevaluating or cabining our political-subdivision standing doctrine.  But the majority does not meaningfully grapple with those arguments here, let alone expressly adopt them.  Instead, the majority purports to *accept* the jurisdictional, decisional rubric laid out in our political-subdivision standing cases but then effectively departs entirely from the requirements of that rubric in resolving this case.  I cannot travel this path.

Therefore, for the foregoing reasons, I respectfully dissent.

16